Good morning, may it please the court. My name is Mario Valencia. I represent the appellant in this case, Brett Depue. In this case, in the middle of the jury deliberations, one of the jurors handed a note to the officer who was watching over the the jury and the note said, I feel as though someone in this room has The court then brought him in, questioned him about it and asked him why he felt someone had poisoned his food or his drink and his immediate response was because I am the odd man out. I just wanted to say before I continue, if I could reserve two minutes for rebuttal. Didn't the court admonish him before the question was asked not to to talk about where the jury stood? So he sort of That's a great, that's a great question. Would you have a great answer for it? Great answer. He, the court did not say that actually before Mr. Depue, I'm sorry, juror number nine blurted that out. The way that I thought he, I thought he said something, that's not how I read the transcript. Did I not read that right? Uh, no, it's on page. I think in the very, at the very least, didn't the court give the general admonition that jurors are not to disclose even in their questions to the court? Well, if that, if that, if that happened, it might have been during the jury instructions, but it wasn't when he brought him, when he brought him in. As a matter of fact, um, in the excerpts of record volume one on page eight, um, the court brings in juror number nine and after he brings in juror number nine, this is, um, page eight, excerpts of record number one, starting at about line 14, the court, uh, well, let's look at, yeah, yeah. Line 14. Yeah. It says, Alan, the court's concerns on our part. Would you tell us, I don't want to do, I don't want you to discuss anything that the jury has been deliberating about. And that's what prompted my question. I read that as saying, don't talk about the deliberation. Just tell me about your health. Right. It says, don't discuss anything the jury's deliberating about. And the poor juror, I guess, maybe felt that he was complying with that by not actually getting into the discussions they had been having. But then the question is on page nine, 18, why it is you feel that someone has poisoned or drugged your food or drink. And then he, his, You can answer that question without, without telling the court where the jury stands. Well, obviously this juror, he's, he wants to answer the question honestly. I know, but the court can't help what people say. I mean, if, just because if a juror blurts something out and you tell them, I don't want to hear about deliberations and they say that, that doesn't automatically make the court wrong because they don't follow the directions. No, no, no. And so nobody, what we're saying here is to answer Judge Talman's question is he does tell him, don't tell us what you're deliberating about, but this gentleman has to answer the question why he feels that his food is being poisoned. How does he answer that question? The only reason, and the only reason he ever gives for why he feels his food is being poisoned, he's just being honest is because he's the odd man out. Well, that could also mean that you're, you're, you're not. I mean, in terms of, I mean, I tried cases for 10 and a half years. I sat in a courtroom for 20 years and I've gotten a lot of things from jurors. I've never seen anyone say that they thought that they were being poisoned. And that is, it's pretty reasonable to think that this is a person not suffering, that is suffering from not enjoying good mental health. But the court doesn't make that finding, Your Honor. There's nowhere in the record that the court engages in any more sort of dialogue with him to find out if his mental health is okay. Well, they ask how he feels, and he's got a headache, he's got a stomach ache, he's got this, and then, you know, and then you put it all together that supposedly he was having mischief with his bike. I mean, it's the — Okay. That's true. He tells them what he was feeling, which is what prompted the note, that after they went in and had some testimony re-read to them, he says, I then began to experience these symptoms. And he says, I was, my heart started beating fast, dizziness, a little bit of a headache. But he said he was poisoned. He was poisoned. That's the, you know, this is not, you know, you're kind of trying to equate this with a situation that this is a man that is a jury, and that the court pulled that out of him, that he was the holdout on the jury, and therefore, people are upset with me, and I'm feeling stressed. That's not the facts of these cases, this case. Well, that's not at all what we're trying to portray. If that's what it seems like, it's not. We're saying this gentleman, the reason he was feeling that he was poisoned, whether right or not, he felt he was being poisoned because he was the holdout on the jury. I'm not saying that the court prided out of him or tried to get him to admit that, but clearly the court, even before he calls him in and asks him a single question, already said the following. This is a direct quote. This is on page 6. This is before any questions even asked. Mr. DePue objects to them taking him off of the jury before a question is asked, and the court says, I see no way that we can, he could continue, Mr. DePue, if he's accusing the other jurors of poisoning him. There's just no way that he could do that. I can't help but think that if the court had left this juror on, and then they came back and convicted your client, you would be standing up before us and saying, the judge left a juror on, you know, set aside this conviction. Your Honor, with all due respect, I don't know what that has to do with, I don't know what would happen down the road, but we're dealing with the record that we have here. Well, I think that would have been the more serious problem, actually. I think a sitting district judge that would allow a juror who displayed bizarre, irrational behavior for which there was absolutely no articulable basis to remain on a jury would be a serious problem. And again, had the court actually said any of that, and maybe inquired a little more? You don't have to say it. I mean, there's a certain amount of understanding, I think, that every participant in the courtroom has about the process. I mean, the lawyers are officers of the court. So they would know that it would be a judge's responsibility to ensure the defendant gets a fair trial. And how do you get a fair trial if you have a juror who thinks, for instance, that Martians are coming down to get them, or that somebody's poisoning them, for which, as I said, there's no articulable basis, or there's a hitman in the jury that's after him? I mean, how does the defendant get a fair trial? Well, again, we're dealing with the record that we have. We're not talking about Martians. We're not talking about the jury. Well, you are. You're talking about somebody poisoning him. Well, what we're saying here is that no further testing was done. Nothing was done in the case to find out. Counsel, that's not true. Direct your attention to page 12. Okay. In line 8, in which the court says, do you think you can participate in deliberations if there's somebody in that group that you can't trust? And he answers, not no, especially no. So why isn't that sufficient for the court to conclude that as a result of whatever the juror's fears are, suspicion that another juror is trying to poison him, he can no longer carry out his duties as a juror? Here's why. You don't have to trust the other jurors on that. Your job as a juror is to draw your own conclusions. But the court asked him if you could continue to participate in deliberations, and the answer is no. He says not... How is it error for the court to conclude at that point that this juror is no longer competent or capable of participating in jury deliberations? Well, he doesn't come out unequivocally and say, no, absolutely no. He says, not especially no. But the court doesn't say anything else about like, look, your job, you don't have to trust anybody, like in the Perez case where the district court told that juror who was emotionally distressed, look, go in there, try to deliberate. I mean, deliberations in that case broke down twice. But the judge said, go back. And the judge never finds... Sorry, I have 50 seconds. The judge in this case never once said, look, I'm going to dismiss you because you can't trust anybody. He says, I'm concerned for his health. But this is a guy who had slight symptoms by the time... Couldn't that include mental health? He doesn't say mental health, and he didn't make any finding about that. And what if, in fact, his food or something had gone bad? He brought his own food, and there was some sort of... Maybe somebody wasn't poisoning it. But we put it so far out in the realm of Martians that maybe something was wrong with his food, and those two just don't... They're not in the same ballpark. Okay. Nobody's talking Martians, aliens. And I take it Mr. Cue did not ask for the food to be sent to the lab for analysis? The court didn't do anything, and the court... Did the defendant ask, is my question. No, the defendant actually says, in one part, I can preserve my food if you wanted evidence. Because the court says, what evidence do you have? But nothing's done, because as soon as he said, well, I don't trust somebody, and I can't especially continue on, the court says, okay, that's it. What would be your remedy? I know we're kind of off the time here. I'm actually... Yeah, yeah, of course. Should the district court have sent him to a psychologist or a psychiatrist for a mental... The juror for a mental evaluation, suspended deliberations until the mental evaluation came back, and then have some kind of a hearing on whether the juror is mentally competent? Is that what you're suggesting? No, I'm suggesting that something more than just simply saying, okay, you don't trust somebody in there, you're out, should have taken place. Something more along the lines of what the district courts have done in Bettez, and in other cases such as that. We're equating a guy who thinks, look, I'm the holdout and something's wrong with my food with somebody who is mentally ill. And we don't have any evidence of that, we don't have any finding of that or anything else, but we also don't have any questioning into that. And to say, well, that's so far out there, as if nothing ever has happened that's inappropriate among jury members, is just, I think, to put blinders on. Things can happen. And the court could have asked this guy, for example, it's a Friday evening. He could have said, you only have slight symptoms. Why don't we just wait? By now, you're not even experiencing a stomachache, we'll wait until Monday. Why immediately say, let's call a new juror in, put the new juror in? And the only reason was because the court said it clearly. He was concerned about the efficacy of a jury verdict. Okay, I think we have your point. Thank you, counsel. Good morning, may it please the court, Adam Flake for the United States. Just briefly, I would direct the court's attention to ER 13, where the court says, well, sir, I'm concerned about your health. And the court didn't specify, necessarily, whether he was concerned about the juror's The juror said that he was having physical problems. He said that he had a headache, stomachache. Even before deliberations began, during the trial, he had accused people of vandalizing his bike. There was certainly something going on with this juror. And the district court acted well, well within its broad discretion when it made a factual finding that this juror was not in the health to continue. And it acted well within its discretion when it decided to dismiss that juror. If the court has any other questions, I'll address them. Well, I'd like to ask you. Go ahead. Please. I was going to ask about the sentencing. Yeah, that was what I thought. Okay. The district court did not adequately explain why it double counted some properties, such as like the 10658 Calico Pines and the 9775 Cornwell Crossing. It counted 9775 Cornwell, which Mr. DePue says is his primary residence, et al., and listed higher sales prices than were true, such as for Corsica, and the government listed the sales prices $740,000, though DePue said it was $620,000. What explanation can you give about all of this? What are we supposed to do? Your Honor, first of all, I noted in my brief that the lack of objection by Mr. DePue puts the government in an extremely difficult position, because I'm not able to bring my case agent up here with me on appeal and have — make an additional record and go through and offer an explanation for how we — how the documents came together in this case. What we did is we appended a bunch of documents to the sentencing memorandum. We, you know, had — talked to the case agent, gave that information to probation, and Mr. DePue didn't object. And so we're not — I'm in a — I'm in a tough spot because I can't — I thought he made — Oh, excuse me, Your Honor. I thought Mr. DePue said on the record that he had no objections to the PSR and that it was accurate. That's correct, Your Honor. That — In light of that admission, how can it be plain error for the court to accept the damages computation? That's the government's position, Your Honor. But to address Your Honor's concern, I don't want to get myself in trouble by going outside of the record, but I am happy to say that — So — In — So your better position, then, is he basically tied your hands and said they're correct, even though I can look at it and see certain things that I don't understand. That's correct, Your Honor. And we would have happily gone through a three-day sentencing if we had needed to. If Mr. DePue had asked us to prove up the loss amount with — and made objections, we easily could have had our case agent come in and testify and prove these things and that in a lot of these frauds, they sold a house several times and they didn't use the proceeds to pay off the prior loans. I mean, I can't address this particular property in this particular case because we don't — I don't want to go outside the record. But that was a standard practice. And so for Mr. DePue, the first time to come along on appeal and say, well, this looks wrong and this looks wrong and this looks wrong, he had his chance, and he can't just make things up without any evidence. He can't just put his own spin on the documents and have deprived us an opportunity to prove up these losses before the district court. The process for doing that is very strictly regulated. There's several rounds of objection and there's an opportunity for an evidentiary hearing. But Mr. DePue having come in and said, other than my dates of incarceration, the PSR is accurate, at this point, we just can't — I don't think that he should be allowed to do that. I think that would put the government in an awkward position going forward where there's no objection, but we still are obligated to call — you know, to put on a bunch of evidence out of fear that on appeal they're going to try to identify problems and the record is going to be lacking. If the Court has no further questions, I'll ask the Court to affirm. Okay. I'll give you a couple minutes on rebuttal. We didn't make anything up on the record and the government isn't in an awkward position. The awkward position is — Well, yeah, but if you say it's right, okay, it's right, then — I remember being a trial judge and if the defendant said it was right and then the prosecutor wants to take a day to really prove it's right, the Court would say, you're not going to waste my time. The defendant says it's right. And then now you get to come up and say, well, you could take it this way, you could take it that way, or whatever. With the issue that the Court brought up, two properties listed again on the same document to show a loss twice for the same property — Well, there may be — — it's a mistake. But counsel — You don't need to put a case agent on the stand to justify that. You can see it. There may — well, maybe not. There may be an explanation for that. As counsel has just indicated, that property may have been sold and then resold, and then there may be some sort of nonpayment. Who knows? No, I'm sorry, Your Honor. That's just not accurate. The fact is, is that right there, it shows the date of the sale and the date of the foreclosure sale and they used the wrong calculation, first of all, which is a question of law, but we don't have time to get into that. But how is it — But just real quick, just to answer this question. Go ahead. It shows the same date, the same foreclosure sale, and the same amount, and then it lists it again for the same thing. You can't have it twice. That's just a plain — that's a plain mistake. But hasn't your client waived it by not raising it? No, that's plain error standard of review, and that's why we're able to raise it. It is up to the court. But what's the manifest — And we're saying it's right there, property listed twice. What's the manifest injustice where the client stipulates or admits that the PSR computations are accurate? Well, I would just point out, Your Honor, that this guy was a guy who was representing himself and I — that's a whole other ballgame. I understand that. But the fact is, is that when he was in prison, he mentioned the fact that he — all of his stuff that he had from the first trial was taken away from him, that he didn't have it anymore. And so then there was a statement made by counsels and the court ordered them to turn over things. I don't even know if Mr. DePue had the 1,000 pages and the loss chart that the government relied on to show what the dollar amount was. But it's incumbent upon the defense, whether he's representing himself or represented by a competent lawyer, to raise that issue with the court and say, I'm not in a position to respond because I don't have the underlying documents. I understand that. But it's also incumbent upon the government to play fair. And what I mean by that is to put in their memo that the calculation, how you determine is by taking the principal amount of the loan and then subtracting the amount that the lender gets from the foreclosure sale, and that's how you end up with the loss. But then turning around and in their chart, presenting to the court that the loss amount is you take the sales price of the property and then subtract the foreclosure, is not playing fair. And then to be able to say, well, those are our mistakes. We're listing properties twice on there, so we're double counting. And we're listing properties that weren't involved in there. And we're not providing you with the loan documentation so you can see the principal amount is not playing fair. How do they get away with it? But a poor guy who's a citizen and represents himself is supposed to know all the rules and object and do all the business. Isn't the loan documentation in the 1,000 pages? Is the what? In the 1,000 pages that support the damages computation? What about the 1,000 pages? Isn't that evidence found in those 1,000 pages? The evidence is absolutely found that they represent, they use the sales price instead of the principal amount after putting in their memo that the right formula is the principal amount. But they had a witness who was there at sentencing who would have been prepared to address all these questions. And in the absence of an objection, there was no reason to call that witness. I have to be honest, Your Honor. I don't know if they had a case agent there or not, but never once in the record, if you take a look at the sentencing transcript, did they say, can we put our case agent on? It would be very unusual, Counselor, in my experience, for the case agent not to be there for sentencing after a major fraud trial. Well, I don't know if that's the case or not. But never did they say, well. Well, we're not going to resolve that either. Thank you very much. Thank you. Case just argued is submitted. We'll get you an answer as soon as we can.
judges: Tallman, Callahan, Ezra